## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Custom Printing of Willmar, Inc., on behalf of itself and all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| International Paper Co; MeadWestvaco Corp.; Norske Skogindustrier ASA; Norske Skog North America LLC; Norske Skog (USA), Inc.; Norke Skog (USA) Holdings, Inc.; Norske Skog Canada Limited; Norske Skog Canada (USA), Inc.; Stora Enso Oyj; Stora Enso North America Corporation; Sappi Limited; S.D. Warren Company; Metsälitto Group; Metsälitto Cooperative; M-real Corporation; M-real USA Corp.; UPM-Kymmene Corporation; Myllykoski Corporation; Madison International Sales Company; and Bowater, Inc. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

04  11583 GAO

CIVIL ACTION NO.:

**CLASS ACTION COMPLAINT**

MAGISTRATE JUDGE _Colon_

RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _Yes_
LOCAL RULE 4.1 ____
WAIVER FORM ____
MCF ISSUED ____
BY DPTY. CLK. _____
DATE _7/15/04_

Plaintiff, Custom Printing of Willmar, Inc., on behalf of itself and a class of all others

similarly situated, brings this federal antitrust action for treble damages against Defendants,

International Paper Co; MeadWestvaco Corp.; Norske Skogindustrier ASA; Norske Skog North

America LLC; Norske Skog (USA), Inc.; Norke Skog (USA) Holdings, Inc.; Norske Skog

Canada Limited; Norske Skog Canada (USA), Inc.; Stora Enso Oyj; Stora Enso North America

Corporation; Sappi Limited; S.D. Warren Company; Metsälitto Group; Metsälitto Cooperative;

M-real Corporation; M-real USA Corp.; UPM-Kymmene Corporation; Myllykoski Corporation;

Madison International Sales Company; and Bowater, Inc. (collectively, "Defendants").

47234

## NATURE OF THE CASE

1.    Plaintiff brings this lawsuit as a class action on behalf of all individuals and entities that purchased Publication Paper in the United States from Defendants, their predecessors, subsidiaries or co-conspirators from at least January 1, 1990 through the present (the "Class Period"). Plaintiff alleges that during the Class Period, Defendants conspired to fix, raise, maintain or stabilize prices for Publication Paper sold in the United States. Because of Defendants' unlawful conduct, Plaintiff and the other class members paid more for Publication Paper than they would have in the absence of Defendants' alleged conduct.

## JURISDICTION AND VENUE

2.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26) to recover treble damages and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violation of Section 1 of the Sherman Act.

3.    In addition, this action is instituted to secure injunctive relief against Defendants to prevent them from further violating Section 1 of the Sherman Act as alleged in this Complaint.

4.    Subject matter jurisdiction is proper pursuant to 28 U.S.C. §1331 and §1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15, 26.

5.    Venue is proper in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §1391(b) and (c) and (d).

6.    Each Defendant transacts business in this district and the cause of action arose, in part, within this district. The interstate trade and commerce described herein is and has been carried out, in part, within this district. The unlawful acts done in violation of the Sherman Act occurred within this district.

47234                                    2

## PARTIES

7.     Plaintiff purchased Publication Paper directly from one or more of the Defendants, or Defendants' subsidiaries or affiliates during the Class Period.

8.     Defendant International Paper Co. ("IP") is a publicly traded corporation organized and existing under the laws of the State of New York with its principal place of business in Stamford, Connecticut. IP's website states, "Sales of almost $25 billion annually are derived from businesses located primarily in the United States, Europe, Latin America, Asia/Pacific and Canada." IP's 2003 annual report states, "Uncoated papers sales were $4.8 billion in 2003 . . . but down from $4.9 billion in 2001. Coated Papers sales were $1.4 billion in 2003, compared with $1.5 billion in 2002 and $1.6 billion in 2001." IP distributes Publication Paper through its distribution division, Xpedx. During the Class Period, IP was engaged in the business of producing and selling Publication Paper within the United States, including this district.

9.     Defendant MeadWestvaco Corporation ("MeadWestvaco") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Stamford, Connecticut. According to its website, "MeadWestvaco is a leading global producer of packaging, coated and specialty papers, consumer and office products and specialty chemicals." MeadWestvaco's paper sales were $2,127,000 out of $7,543,000 total sales, according to its website. During the Class Period, MeadWestvaco was engaged in the business of producing and selling Publication Paper within the United States, including this district.

10.     Defendant Norske Skogindustrier ASA ("Norske Skog") is a company organized under the laws of Norway with its principal place of business in Lysaker, Norway. According to its website, "Norske Skog is the world's second largest producer of publication paper . . . . [The

47234                                    3

company] has a 13% share of the global market for newsprint and magazine paper." During the Class Period, Norske Skog was engaged in the business of producing and selling Publication Paper within the United States, including this district.

11.    Defendant Norske Skog North America LLC ("Norske Skog North America") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Seattle, Washington. According to its website, Norske Skog North America was "formed on January 1, 2002, and [is] jointly owned by Defendants Norske Canada and Norske Skog, [and] markets specialty paper products previously sold by four companies: Norske Skog, Norske Skog Canada, Pacifica Papers, and Haindl." During the Class Period, Norske Skog North America, on its own and/or through Norske Skog, was engaged in the business of producing and selling Publication Paper within the United States, including this district.

12.    Defendant Norske Skog (USA), Inc. ("Norske USA") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Southport, Connecticut. During the Class Period, Norske USA, on its own and/or through Norske Skog, was engaged in the business of producing and selling Publication Paper within the United States, including this district.

13.    Defendant Norske Skog (USA) Holdings, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Southport, Connecticut. During the Class Period, Norske Skog (USA) Holdings, Inc., on its own and/or through Norske Skog, was engaged in the business of producing and selling Publication Paper within the United States, including this district.

47234                    4

14.    Defendant Norske Skog Canada Limited ("Norske Canada") is a Canadian public company federally incorporated under the Canadian Business Corporation Acts with its principal place of business in Vancouver, BC. According to its 2003 Annual Report, Defendant Norske Skog owns approximately 30% of Norske Canada. During the Class Period, Norske Canada, on its own and/or through Norske Skog, was engaged in the business of producing and selling Publication Paper within the United States, including this district.

15.    Defendant Norske Skog Canada (USA), Inc. is a corporation organized and existing under the laws of the State of California with its principal place of business in Seattle, Washington. During the Class Period, Norske Skog Canada (USA) was engaged in the business of producing and selling Publication Paper within the United States, including this district.

16.    Defendant Stora Enso Oyj ("Stora Enso") is a corporation organized and existing under the laws of the Republic of Finland with its principal place of business in Helsinki, Finland. According to its 2003 Annual Report, Stora Enso's market share is 18% in North America and 18% globally. During the Class Period, Stora Enso was engaged in the business of producing and selling Publication Paper within the United States, including this district.

17.    Defendant Stora Enso North America Corporation ("Stora Enso North America") is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business in Wisconsin Rapids, Wisconsin. According to its website, "Stora Enso North America is North America's leading producer of coated and supercalendered papers for the printing and publishing industries." During the Class Period, Stora Enso North America was engaged in the business of producing and selling Publication Paper within the United States, including this district.

47234                                     5

18.    Defendant Sappi Limited ("Sappi") is a company organized and existing under the laws of the Republic of South Africa with its principal place of business in Braamfontein, Johannesburg 2001, Republic of South Africa. According to its website, "Sappi Fine Paper's operations are managed through three regional business units, Sappi Fine Paper North America, Sappi Fine Paper Europe and Sappi Fine Paper South Africa. Sappi Fine Paper is the leading producer of coated fine paper in North America, Europe and Africa. We have a total paper capacity of 4.3 million metric tons and the division represents 83% of group sales and 66% of group operating income, contributing $190,000,000 in 2003." In December 1994, Defendant Sappi and a group of financial investors acquired S.D. Warren, the market leader in the United States in coated fine paper and a major purchaser of other specialty paper products. The S.D. Warren Company now does business as Sappi Fine Paper North America. During the Class Period, Sappi was engaged in the business of producing and selling Publication Paper within the United States, including this district.

19.    Defendant S.D. Warren Company ("S.D. Warren") doing business as Sappi Fine Paper North America, is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in Boston, Massachusetts. In December 1994, Defendant Sappi and a group of financial investors acquired S.D. Warren, the market leader in the United States in coated fine paper and a major purchaser of other specialty paper products. The S.D. Warren Company now does business as Sappi Fine Paper North America. During the Class Period, S.D. Warren was engaged in the business of producing and selling Publication Paper within the United States, including this district.

20.    Defendant Metsälitto Group is organized and existing under the laws of the Republic of Finland with its principal place of business in Finland. According to its website,

"Metsälitto is one of Europe's biggest forestry groups" and "[t]he companies that make up Metsälitto Group specialize in selected wood and fibre based products and services." Those companies include Defendant M-real. During the Class Period, Metsälitto Group, on its own and/or through Metsälitto Cooperative was engaged in the business of producing and selling Publication Paper within the United States, including this district.

21.    Defendant Metsälitto Cooperative is organized under the laws of the Republic of Finland with its principal place of business in Finland. Metsälitto Cooperative is a cooperative organization for Finnish forest owners and has approximately 130,000 members. During the Class Period, Metsälitto Cooperative, on its own and/or through Metsälitto Group, was engaged in the business of producing and selling Publication Paper within the United States, including this district.

22.    Defendant M-real Corporation ("M-real") is organized and existing under the laws of the Republic of Finland with its principal place of business in Finland. During the Class Period, M-real was engaged in the business of producing and selling Publication Paper within the United States, including this district.

23.    Defendant M-real USA Corp. ("M-real USA") is organized and existing under the laws of the State of Wisconsin with its principal place of business in Wisconsin Rapids, Wisconsin. During the Class Period, M-real USA was engaged in the business of producing and selling Publication Paper within the United States, including this district.

24.    Defendant UPM-Kymmene Corporation ("UPM") is organized and existing under the laws of the Republic of Finland with its principal place of business in Helsinki, Finland. According to its website, "UPM is one of the world's leading forest products companies. The company's businesses focus on magazine papers, newsprint, fine and specialty papers,

47234                                      7

converting materials and wood products." During the Class Period, UPM was engaged in the

business of producing and selling Publication Paper within the United States, including this

district.

25.    Defendant Myllykoski Corporation ("Myllykoski") is organized and existing

under the laws of the Republic of Finland with its principal place of business in Helsinki,

Finland. According to its website, "The international and independent Myllykoski Group is

directly owned by the Myllykoski Corporation and its partner companies. Myllykowki Group is

made up of MD Lang Papier, Myllykoski North America and Myllykoski Paper. The

Myllykoski Group is highly focused and ranks number three in production of [supercalendered

paper] in the world. In the production of [light-weight coated paper] the Myllykoski Group is in

the top four. The Myllykoski Group's 2003 Net Sales in North America was 19%. Myllykoski

Corporation's partners are M-real Corporation, the New York Times Company (US), the new

alliance partner Rhein Papier GmbH (Germany), and Sunila (Finaland), associated company of

Myllykoski Paper." During the Class Period, Myllykoski was engaged in the business of

producing and selling Publication Paper within the United States, including this district.

26.    Defendant Madison International Sales Company ("Madison") is a company

organized and existing under the laws of the State of Delaware with its principal place of

business in Norwalk, Connecticut. Madison's website states that "Madison International is the

U.S. sales company for the Myllykoski group of paper mills." It also states, "Myllykoski has

sales offices all around the world, all part of the vast Myllykoski Sales Network. Madison

International is part of that sales network, and is owned by the mill, the only difference being

that we use the name 'Madison' here in the U.S. since it's so well known with customers. But

when you think of us, you can think of Myllykoski. Myllykoski is the world's 3rd largest

producer of groundwood-contaiting uncoated and coated publication papers." Madison Paper

Industry, one of two divisions of Madison, is 40% owned by the New York Times Company.

During the Class Period, Madison was engaged in the business of producing and selling

Publication Paper within the United States, including this district.

27.    Defendant Bowater, Inc. ("Bowater") is a corporation organized and existing

under the laws of the State of Delaware with its principal place of business in Greenville, South

Carolina. Bowater's website states that Bowater "is a leading producer of newsprint and coated

mechanical papers." During the Class Period, Bowater was engaged in the business of producing

and selling Publication Paper within the United States, including this district.

## CO-CONSPIRATORS

28.    Various other persons, firms or corporations, not yet named as Defendants in this

lawsuit, participated as co-conspirators with Defendants in the offenses alleged and performed

acts and made statements in furtherance thereof.

## CLASS ACTION ALLEGATIONS

29.    Plaintiff brings this action on behalf of itself and as a class action under the

provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of

the following class:

> All persons (excluding governmental entities, Defendant, their
> subsidiaries and affiliates, and their co-conspirators) who
> purchased Publication Paper in the United States directly from any
> of the Defendants or any subsidiary or affiliate thereof, or any co-
> conspirator, at any time during the class period from January 1,
> 1990 to the present (the "Class").

30.    Plaintiff does not know the exact size of the class, since such information is in the

exclusive control of Defendants. However, based on the nature of the trade and commerce

involved, Plaintiff believes that the class numbers at least in the thousands and that the members

47234                            9

of the class are geographically dispersed throughout the United States. Therefore, joinder of all members of the class would be impracticable.

31.    There are questions of law or fact common to the class, including, but not limited to:

    a.    whether Defendants conspired to fix, raise, maintain or stabilize the prices of Publication Paper sold in the United States;

    b.    whether the alleged contract, conspiracy or combination violated Section 1 of the Sherman Act;

    c.    the duration and extent of the contract, conspiracy or combination alleged herein;

    d.    whether the Defendants and their co-conspirators took affirmative steps to conceal the contract, conspiracy or combination;

    e.    whether each of the Defendants was a participant in the contract, conspiracy or combination alleged herein;

    f.    whether the Defendants' conduct caused the prices of Publication Paper to be set at an artificially high and non-competitive level;

    g.    whether Defendants conspired to allocate markets for Publication Paper sold in the United States;

    h.    whether Defendants' conduct caused injury to the business or property of Plaintiff and the class members and, if so, the appropriate class-wide measure of damages;

    i.    whether Defendants took steps actively to conceal their conspiracy; and

    j.    whether Plaintiff and the Class are entitled to declaratory and/or injunctive relief.

These and other questions of law and fact predominate over any questions affecting only individual members of the class.

32.    The claims of Plaintiff are typical of the claims of the class in that Plaintiff, through the aforementioned assignment, is a direct purchaser of Publication Paper whose

47234

10

purchases were, in all relevant respects, typical of purchases by other class members, and the relief sought by Plaintiff, monetary damages, is common to the class.

33.    Plaintiff will fairly and adequately protect the interests of the class in that Plaintiff is a typical purchaser of Publication Paper, has no conflicts with any other members of the class and is represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation. Further, the interests of Plaintiff are coincident with, and not antagonistic to, those of the class members.

34.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy described herein, because such treatment permits a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence and effort. Class treatment also permits the adjudication of claims by smaller class members who could not afford to individually litigate an antitrust claim against large corporate defendants.

35.    Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

## **TRADE AND COMMERCE**

36.    All of the Defendants manufacture and/or sell Publication Paper either independently or as part of a joint venture or merger. The Publication Paper products manufactured and/or sold by one Defendant are comparable to and interchangeable with the Publication Paper products manufactured and/or sold by the other Defendants.

47234                                11

37.    During the Class Period, Defendants sold Publication Paper in a continuous and uninterrupted flow of interstate commerce, to customers located in countries and states other than the countries or states in which Defendants produced Publication Paper. The business activities of Defendants were thus within the flow of, and substantially affected, interstate trade and commerce.

## FACTS

38.    The term "Publication Paper" includes Magazine Paper. The term "Magazine Paper" includes both uncoated paper and coated magazine paper. As Defendant Stora Enso states on its website, uncoated magazine paper "is used mainly for periodicals and advertising material, such as inserts and flyers. It is also suitable for mass circulation TV magazines and catalogues." As Defendant International Paper states in their 2003 Annual Report, uncoated papers are used for "advertising and promotional materials, such as brochures, pamphlets, greeting cards, books, annual reports and direct mail publications." With respect to coated magazine paper, Defendant Stora Enso states on its website that it is available "in various matte, silk, and glossy grades [and] is used for special interest and general interest magazines. Other end-uses include supplements, home-shopping catalogues, and magazine covers." As Defendant International Paper states in their 2003 Annual Report, coated papers are "used in a variety of printing and publication end uses such as catalogs, direct mailings magazines, inserts and commercial printing."

### The World-Wide Antitrust Agency Raids on the Defendants' Operations.

39.    On Tuesday, May 25, 2004, the Reuters news agency reported the following:

> A swathe of leading global forestry firms were raided by
> competition enforcers on Tuesday as part of antitrust
> operations on both sides of the Atlantic regarding price-

fixing and manipulation of markets for various paper
products.

Raids were carried out by local or European Union antitrust
authorities at Finland's UPM-Kymmene, Stora Enso,
Metsalitto and M-real and Norway's Norske Skog.  U.S. and
Canadian authorities cooperated.

International Paper Co., the top North American forest
products company, said it had been contacted by U.S.
officials in connection with the probe.

Later on Tuesday, the U.S. Justice Department confirmed it
is investigating possible anti-competitive practices in the
market for magazine paper. A department spokeswoman
said the probe covers the sale of magazine paper in the
United States and elsewhere.
. . .

The investigation also reached South Africa, where pulp and
paper maker Sappi said its European head office had been
raided. The company, the largest producer of fine paper
used for glossy magazines, said it had agreed to cooperate
with EU officials.

40.    On May 25, 2004, the European Commission's spokesperson for Competition

issued a press release and stated the following:

Following press inquiries, the European Commission's
spokesperson for Competition has confirmed that, on 25
May 2004, Commission inspectors, assisted by officials
from the national competition authorities of the Member
States concerned, launched simultaneous unannounced
inspections at the premises of some of the major European
producers of paper and forestry products.

The purpose of these inspections is to ascertain whether
there is evidence of cartel agreements and related illegal
practices concerning price-fixing, fixing of other
commercials terms, and/or allocation of customers. Several
product markets in the European paper and forestry products
sector would be affected the alleged arrangements.

The Commission's spokesperson has also confirmed that the
inspections have been carried out in close coordination with

competition authorities in a number of EU countries, as well as the US and Canada. The EFTA Surveillance Authority, at the request of the Commission, participated in the inspections at premises of undertakings in the EFTA Member States.

Surprise inspections are a preliminary step in investigations into suspected cartels.

41.    On May 25, 2004, the EFTA Surveillance Authority, an organization charged with enforcing competition laws with respect to EFTA Member States Iceland, Liechtenstein and Norway, issued a press release and stated the following:

Following inquires from journalists; the EFTA Surveillance Authority confirms that on 25 May 2004, inspectors from the EFTA Surveillance Authority, assisted by officials from the Norwegian Competition Authority, carried out an unannounced inspection at the premises of a producer of publication paper in Norway. The purposes of the inspection is to ascertain whether there is evidence of cartel agreements and related illegal practices amongst EEA producers of publication paper and amongst acquirers of recovered paper. …

Surprise inspections are a preliminary step in investigations into suspected cartels.
…

42.    On May 27, 2004, the Reuters news agency reported that Defendant Stora Enso's CEO Jukka Harmala "told a forest industry seminar arranged by banking group Nordea that '[t]he time span (of the investigation). . . is likely not focusing on the past few years, but can go back as far as (the) late eighties." The Bloomberg News Agency also reported on May 28, 2004 that Stora's CEO said that the investigation may lead back to the late 1980s. Reuters also reported on May 27, 2004 that Defendant Myllykoski Corporation's CEO Carl Bjornberg stated at the same seminar that the industry had been "very much cartelized" during at least a portion of the Class Period.

possible price co-operation within i) the area of publication paper, which includes newsprint and magazine paper and ii) the purchase of recovered paper.

46.    On May 24, 2004, Defendant M-real issued a press release in which it stated the following:

> European Commission investigators have today visited M-real Corporation's premises. The investigation is related to the claimed cooperation between the competitors in fine paper.

47.    On May 25, 2004, Defendant Sappi issued a press release in which it stated the following:

> A team of officials from the European Commission and the Belgian Competition Authority have today visited Sappi Fine Paper's European Head Office in Brussels as part of a wide-spread anti trust investigation into a number of paper manufacturers and appears to involve a wide range of products.

48.    On May 25, 2004, Defendant Stora Enso issued a press release in which it stated the following:

> European Commission competition investigators have today visited Stora Enso's premises in London, Stockholm, and Dusseldorf.

> Representatives of the Finnish Competition Authority visited Stora Enso Forest's office at Imatra and regional offices at Summa, Joensuu, Savonlinna and Kuopio in Finland.

> In addition, the Company's North American division has received a subpoena for documents from the Antitrust Division of the US Department of Justice.

## Defendants' Unlawful Contract, Conspiracy or Combination.

49.    Beginning at least as early as January 1, 1990, and continuing through present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in a

47234

16

continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the price of Publication Paper in the United States.

50.    In formulating and effectuating the alleged contract, conspiracy or combination, Defendants and their co-conspirators engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain or stabilize the price of Publication Paper in the United States.  These activities included the following:

a.    Defendants exchanged information on prices being charged for Publication Paper sold to customers;

b.    Defendants agreed to charge prices at specified levels and otherwise to increase and/or maintain the price of Publication Paper in the United States and elsewhere;

c.    Defendants issued price announcements and price quotations in accordance with the agreements reached; and

d.    Defendants sold Publication Paper in the United States at non-competitive prices.

51.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

52.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiff and members of the Class purchased Publication Paper from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

53.    In formulating and effectuating the contract, conspiracy or combination, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain and/or stabilize the price of Publication Paper sold in the United States. These activities included the following:

47234                                          17

a.    Defendants participated in meetings and/or conversations, including through various trade organizations and conventions, to discuss the price of Publication Paper in the United States;

b.    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Publication Paper sold in the United States;

c.    Defendants agreed during those meetings and conversations to fix the price of Publication Paper; and

d.    Defendants issued price announcements and price quotations in accordance with the agreements reached.

54.    Defendants' contract, conspiracy or combination constitutes an unreasonable restraint of interstate and foreign trade and commerce in violation of Sections 1 and 3 of the Sherman Act.

55.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their business and property in that they have paid more for Publication Paper than they would have paid in a competitive market.

56.    The unlawful contract, conspiracy and/or combination has had the following effects, among others:

a.    price competition in the Publication Paper market has been artificially restrained;

b.    prices for Publication Paper sold by the Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels;

c.    purchasers of Publication Paper from the Defendants have been deprived of the benefit of free and open competition in the markets for Publication Paper.

57.    As a direct and proximate result of the illegal contract, conspiracy or combination, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in that they paid more for Publication Paper than they would

18

47234

have paid in the absence of the illegal contract, conspiracy or combination. Plaintiff and members of the Class thus have suffered damages in an amount presently undetermined. Defendants and their co-conspirators are jointly and severally liable for all damages cause by their conspiracy.

## FRAUDULENT CONCEALMENT

60.    Until recently, neither Plaintiff nor the class members had knowledge of any of the violations alleged herein. Further, neither Plaintiff nor the class members, until recently, could have discovered, by the exercise of reasonable diligence, that Defendants and their co-conspirators had engaged in the violations alleged herein since Defendants and their co-conspirators actively and fraudulently concealed these violations so as to obscure their illegal activity.

61.    Defendants engaged in a successful, illegal price-fixing conspiracy that, by its nature, was inherently self-concealing.

62.    Plaintiff and the class members could not have discovered the alleged contract, combination and conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques secrecy employed by Defendants and their co-conspirators to avoid detection of, and to fraudulently conceal, their contract, combination and conspiracy. Defendants fraudulently concealed the contract, combination and conspiracy herein alleged by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers concerning the reason for price increases and surreptitious communications between Defendants by the use of the telephone or in-person meetings at trade associations meetings (and elsewhere) in order to prevent the existence of written records.

47234                                   19

63.    The affirmative actions of the Defendants herein alleged were wrongfully concealed and carried out in a manner that precluded detection.

64.    Defendant also fraudulently concealed their contract, conspiracy or combination in other ways as well. For example, Defendants falsely represented to their customers that Publication Paper price increases were due to increases in the cost and supply of raw materials when, in fact, these price increases were the direct result of collusive activity among Defendants as alleged herein.

65.    By virtue of the fraudulent concealment by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiff and the other class members have as a result of the unlawful contract, combination and conspiracy alleged in this Complaint

## EFFECTS/DAMAGES

66.    Defendants' contract, combination and conspiracy had the following effects, among others:

   a.    prices charged by Defendants and their respective subsidiaries and co-conspirators to Plaintiff and the members of the class were maintained at artificially high and non-competitive levels;

   b.    buyers of Publication Paper were deprived of free and open competition in the purchase of Publication Paper; and

   c.    competition in the sale of Publication Paper was unreasonably restrained.

67.    During and throughout the Class Period, Plaintiff and members of the class purchased Publication Paper from one or more of the Defendants, their respective subsidiaries, affiliates and/or co-conspirators.

47234

68.     As a direct and proximate result of Defendants and their co-conspirators' illegal contract combination and conspiracy, Plaintiff and the members of the class were injured and financially damaged in their businesses and property in that they paid more for Publication Paper than they would have in the absence of Defendants and their co-conspirators' unlawful activities. The total amount of damages is presently undetermined.

69.     The contract, conspiracy or combination complained of herein will continue absent an injunction. Plaintiff and members of the Class are likely to buy Publication Paper in the future and will be repeatedly injured unless the continuation of this contract, conspiracy or combination is enjoined.

## PRAYER FOR RELIEF

70.     WHEREFORE, Plaintiff prays as follows:

a.     That the Court determine this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

b.     That the aforesaid contract, combination and conspiracy and the acts done in furtherance thereof by Defendants be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, and that Plaintiff and the members of the class have been injured in their businesses and property as a result of such violations;

c.     That judgment be entered for Plaintiff and the members of the class against Defendants for three-fold the amount of damages sustained by Plaintiff and the class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

d.     That Plaintiff and members of the Class be awarded pre-and post-judgment interest and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

e.     That Defendants, their affiliates, successors, transferees, assignees, and the officers directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the contract, conspiracy or

47234

combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and (2) communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of Publication Paper, information concerning prices or other terms or conditions of sale of any such products except to the extent necessary in connection with bona fide sales transactions between the parties to such communications; and

f.      That Plaintiff and members of the class have such other, further and different relief as the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

71.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury of all the issues triable of right by jury.

DATED: July 15, 2004                    **BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**

Peter A. Pease
One Liberty Square
Boston, MA  02109
Telephone: (617) 542-8300
Facsimile:  (617) 542-1194

Samuel D. Heins
Vincent J. Esades
**HEINS MILLS & OLSON, P.L.C.**
3550 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402
Telephone:  (612) 338-4605
Facsimile:  (612) 338-4692

47234                                      22